UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :    **ECF CASE**

       - v. -                 :    08 Cr. 363 (BSJ)

ROBERT ANTHONY GONZALEZ, et al.,  :

          Defendants.       :
- - - - - - - - - - - - - - - - - -x

## <u>GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS</u>

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jillian B. Berman
Marissa Molé
Assistant United States Attorneys
    -Of Counsel-

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.      Defendants' Motions To Suppress Physical Evidence
        Recovered From the Honda Accord Should Be Denied
        Without a Hearing Because There Are No Disputed Issues
        of Material Facts and Their Claims Fail as a Matter of
        Law . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.   Applicable Law . . . . . . . . . . . . . . . . 12

        B.   Discussion . . . . . . . . . . . . . . . . . . 26

II.     Williams' Motion To Suppress His Post-Arrest Statement
        Should Be Denied Without A Hearing Because There Are No
        Disputed Issues of Material Facts . . . . . . . . . 32

        A.   Applicable Law . . . . . . . . . . . . . . . . 33

        B.   Discussion . . . . . . . . . . . . . . . . . . 35

III.    Gonzalez's Motion to Suppress The Crack Cocaine
        Recovered From His Person Should Be Denied Without a
        Hearing Because There Was Reasonable Suspicion To
        Conduct The Search . . . . . . . . . . . . . . . . 36

        A.   Applicable Law . . . . . . . . . . . . . . . . 36

        B.   Discussion . . . . . . . . . . . . . . . . . . 41

IV.     Richardson's Motion to Dismiss the Indictment
        For Insufficient Evidence Should Be Denied . . . . 43

V.      Richardson's Motion to Disclose Grand Jury Minutes
        Should Be Denied . . . . . . . . . . . . . . . . . 47

        A.   Applicable Law . . . . . . . . . . . . . . . . 47

        B.   Discussion . . . . . . . . . . . . . . . . . . 51

VI.     Gonzalez' Motion for Severance or a Bifurcated Trial on
        Count VI Should Be Denied As Premature . . . . . . 52

VII.      Gonzalez's Discovery Motion Should Be Denied As Moot 54

VIII.     The Defendants' Motion for Production of Brady and
          Giglio Material Should Be Denied As Moot . . . . . 55

IX.       Defendants' Demand For 404(b) Evidence . . . . . . 58


CONCLUSION   . . . . . . . . . . . . . . . . . . . . . 60

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :     **ECF CASE**

            - v. -                :     08 Cr. 363 (BSJ)

ROBERT ANTHONY GONZALEZ, et al.,  :

                Defendants.       :
- - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

### PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in opposition to the pre-trial motions filed by defendants Robert Gonzalez, Rasheem Richardson, and Khalil Williams.  The defendants' motions request: (i) suppression of physical evidence and post-arrest statements; (ii) dismissal of the indictment; (iii) disclosure of the Grand Jury minutes; (iv) disclosure of Rule 404(b) evidence; (v) severance of Count VI of the indictment or alternatively, a bifurcated trial on Count VI; (vi) additional discovery; and (vii) disclosure of exculpatory and impeachment material and the identity of any confidential informants.[1]

The defendants' motions should be denied in their entirety without a hearing.  On March 25, 2008, the defendants were detained by the police based on a reasonable suspicion that

---

[1]     In addition, the defendants join in each others' motions.

1

they were about to commit a robbery of an electronics store in the Bronx. That suspicion quickly ripened into probable cause for their arrests based on the fact that the first individual detained was found to be wearing latex gloves, and the car from which he had exited was found to contain, among other things, ski masks, large laundry bags, duct tape, and additional latex gloves. During a subsequent inventory search, the police further found a loaded .45 caliber Taurus semi-automatic pistol and a starter pistol under the rug in front of the driver's seat of the defendants' car. The defendants now seek a hearing on these issues in order to suppress the evidence found in the car; however, none of these material facts are in dispute. Based on an objective analysis of these events, as required by the law, the search and seizure of the defendants and the car was lawful and thus, the defendants' motions to suppress the physical evidence should be denied.

Similarly, Khalil Williams has moved to suppress his post-arrest statement but has not disputed his own written admission that he was read his rights and knowingly agreed to waive them. Williams' failure to dispute this is particularly notable given that he has submitted a factual affidavit that addresses certain factual issues but not this one. Absent any such factual dispute, Williams has no basis to suppress his statement.

2

The defendants have further failed to state any basis for their motions to dismiss the indictment and to compel disclosure of Grand Jury minutes, 404(b) evidence, confidential informants, and 3500 material.  The Government has complied, and will continue to comply, with Rule 16 and its other disclosure obligations, and there is no basis to compel early production of any additional materials at this time.  Gonzalez's motion to sever or bifurcate the felon in possession count against him from the other charges is likewise premature, especially given the fact that the Government may seek to offer evidence of his prior felony conviction as 404(b) evidence at trial.

Finally, Gonzalez challenges the strip search of his person conducted at the police precinct after his arrest, during which a plastic bag containing approximately 23 bags of crack cocaine were discovered protruding from his buttocks.  However, based on the indisputable facts leading to that search, the search was supported by reasonable suspicion and therefore legal.

Accordingly, for the reasons set forth in more detail below, the defendants' motions should be denied in their entirety and without a hearing.  Moreover, because all of these issues turn on questions of law or facts that are presently not in dispute, and thus, in the Government's view, can be resolved without a hearing, the Government respectfully requests that the Court adjourn the September 26, 2008 hearing date indefinitely.

3

Were the Court to go forward with the hearing on September 26th on all of the issues raised by the defendants, the Government would need to prepare and have available a number of law enforcement witnesses whose testimony may otherwise be unnecessary.  The Government submits that such a time-intensive hearing would not be the best use of the Court's and the parties' resources, and for that reason the Government requests that the hearing be postponed.  Once the Court has had an opportunity to analyze the issues, however, and should the Court determine that a hearing is necessary on one or more issues, a hearing date can be scheduled and the Government can call only those witnesses whose testimony relates to the disputed issues.

**BACKGROUND**

A.    <u>March 25, 2008</u>

On or about March 25, 2008, members of the New York City Police Department ("NYPD") received a tip related to a potential armed robbery in the Bronx.  In particular, Detective John Badyna received a tip from a source who has provided reliable information in the past (the "tipster").  (Badyna Aff. ¶ 3).  The tipster informed Detective Badyna that several individuals who were likely to be armed were planning a robbery that evening of an electronics store located at 20 Bruckner Boulevard in the Bronx, New York.  (<u>Id.</u>).  The tipster also informed Detective Badyna that the individuals would be arriving

4

in a dark-colored car.  (Id.).  Following that tip, Detective

Badyna confirmed that there is an electronics store called Media

Plaza located at 20 Bruckner Boulevard, Bronx, New York, and he

and an NYPD Sergeant ("Sergeant-1"), drove to Media Plaza around

8:00 p.m.  (Badyna Aff. ¶ 4; Compl. ¶¶ 8(a) and (b)).[2]  Detective

Badyna and Sergeant-1 parked in front of Media Plaza in an

unmarked police car.  (Badyna Aff. ¶ 4; Compl. ¶ 8(b)).  At

approximately 8:20 p.m., Detective Badyna observed a dark gray

Honda Accord drive slowly past Media Plaza and pull into a

parking space a few spaces past the entrance of Media Plaza on

the opposite side of the street from the store.  (Badyna Aff. ¶

5; Compl. ¶ 8(b)).

      After several minutes, Detective Badyna observed the

defendant later identified as Robert Anthony Gonzalez exit the

Honda Accord from the back driver's side door.  (Badyna Aff. ¶ 6;

Compl. ¶ 8(c)).  Gonzalez walked past the Honda Accord toward the

next street corner away from Media Plaza, then walked across

Bruckner Boulevard and back toward Media Plaza.  (Badyna Aff. ¶

---

[2] "Compl." refers to the complaint filed in this case on March 27,
2008; "Badyna Aff." refers to the affidavit of Detective John
Badyna, dated September 5, 2008, submitted with the Government's
memorandum of law of September 5, 2008; "Gonzalez Aff." refers to
the affidavit of defendant Robert Anthony Gonzalez, dated August
12, 2008, and submitted with Gonzalez's memorandum of law dated
August 9, 2008 ("Gonzalez Br."); "Williams Aff." refers to the
affidavit of defendant Khalil Williams, dated July 22, 2008, and
submitted with Williams' memorandum of law dated August 1, 2008
("Williams Br."); and "Richardson Aff." refers to the affidavit of
defendant Rasheem Richardson, dated July 21, 2008, and submitted
with Richardson's memorandum of law dated July 28, 2008
("Richardson Br.").

6; Compl. ¶ 8(c)).  As Gonzalez approached the Media Plaza entrance, he peered into the store and then slowly doubled back to the waiting Honda Accord across the street, and got back inside.  (Badyna Aff. ¶ 6; Compl. ¶ 8(c)).  As Gonzalez walked around the area, he appeared to be talking on his cellular telephone.  (Badyna Aff. ¶ 6; Compl. ¶ 8(c)).

At this point, traffic cleared from the street behind where the Honda Accord was parked.  (Badyna Aff. ¶ 7; Compl. ¶ 8(d)).  Detective Badyna then observed the Honda Accord slowly back up and re-park directly across the street from Media Plaza.  (Badyna Aff. ¶ 7; Compl. ¶ 8(d); Richardson Aff. ¶ 2).  A few moments later, Detective Badyna saw Gonzalez get back out of the Honda Accord and walk back across the street toward both Media Plaza and the car in which Detective Badyna was sitting.  (Badyna Aff. ¶ 8; Compl. ¶ 8(e); Richardson Aff. ¶ 2).  Gonzalez again appeared to be talking on his cell phone.  (Badyna Aff. ¶ 8; Compl. ¶ 8(e)).

As Gonzalez crossed the street towards Media Plaza, he suddenly changed direction and walked around the front of Detective Badyna's car and peered inside the front window.  (Badyna Aff. ¶ 9; Compl. ¶ 8(e)).  The side and back windows of the unmarked police car were tinted, but the front window was not.  (Badyna Aff. ¶ 9).  Detective Badyna was crouched down in the driver's seat of the car and Sergeant-1 was in the back seat.

6

(Badyna Aff. ¶ 9).  As soon as Gonzalez made eye contact with Detective Badyna, he immediately turned and swiftly began to leave the area away from both the Honda Accord and Media Plaza. (Badyna Aff. ¶ 9; Compl. ¶ 8(e)).

As Gonzalez looked into the front window of the police car, Detective Badyna noticed that Gonzalez's hands looked peculiar.  (Badyna Aff. ¶ 10).  When Gonzalez then began walking swiftly away from their car, Detective Badyna and Sergeant-1 followed him.  (Badyna Aff. ¶ 10; Compl. ¶ 8(e)).  As those officers reached Gonzalez in the street, Detective Badyna saw that Gonzalez was wearing latex gloves on his hands.  (Badyna Aff. ¶ 10; Compl. ¶ 8(e)).  A photograph of Gonzalez's hands as they appeared at the time he was detained is attached to the Badyna Aff. as Exhibit A.  (See also Gonzalez Aff. ¶ 2; Gonzalez Br. ¶ 18 (acknowledging that Gonzalez was in fact wearing latex gloves at the time of his arrest)).  Sergeant-1 and Detective Badyna then detained Gonzalez and placed handcuffs on him. (Badyna Aff. ¶ 10; Compl. ¶ 8(f); Gonzalez Aff. ¶¶ 3-4). Gonzalez is a large man and at the time of his arrest, he was wearing loose-fitting clothing. (Badyna Aff. ¶ 10).

As Detective Badyna and Sergeant-1 were apprehending Gonzalez, additional officers in the area approached the Honda Accord from which Gonzalez had exited.  (Badyna Aff. ¶ 11; Compl. ¶ 8(f); Gonzalez Aff. ¶ 5; Richardson Aff. ¶ 3).  Inside of the

Honda Accord, the officers found defendant Mark Franco in the driver's seat, Khalil Williams in the passenger seat, and Rasheem Richardson in the back seat. (Compl. ¶ 8(f); Williams Aff. ¶¶ 2-3; Richardson Aff. ¶ 2). Officers found Williams with a roll of duct tape in his lap and a pair of latex gloves. (Compl. ¶ 8(f)). Officers further observed additional latex gloves, ski masks, and laundry bags strewn inside the Honda Accord, among other things. (Badyna Aff. ¶ 11; Compl. ¶ 8(f)). Officers placed the three occupants of the Honda Accord under arrest and all four defendants were taken to the 40th Precinct in the Bronx. (Badyna Aff. ¶ 11; Compl. ¶ 8(f)).

Later, as part of a subsequent inventory search of the Honda Accord, officers discovered a loaded .45 caliber Taurus semi-automatic pistol and a starter pistol under the rug in front of the driver's seat of the Accord. (Compl. ¶ 8(f)).

B.    Search of Robert Anthony Gonzalez

Once at the 40th Precinct, Detective Badyna and other law enforcement officers conducted a strip search of Gonzalez. (Badyna Aff. ¶ 12). At that time, Detective Badyna knew, based on his twenty-two years of law enforcement experience, that there are numerous places in or on his body where Gonzalez may have hidden a weapon or other contraband. (Badyna Aff. ¶ 12). Detective Badyna also knew from his experience that individuals who are arrested for felony offenses sometime hide weapons inside

8

of them or on their person, and such weapons (or contraband) are not always detected during a pat-down search. (Badyna Aff. ¶ 12).

The strip search of Gonzalez occurred in a bathroom at the 40th Precinct. (Badyna Aff. ¶ 13). In addition to Detective Badyna and Gonzalez, three other police officers were present. (Badyna Aff. ¶ 13). When Detective Badyna pulled Gonzalez's pants down, he observed a piece of a plastic bag protruding from his buttocks. (Badyna Aff. ¶ 13). Detective Badyna removed that bag and it contained approximately 23 bags of a substance that field tested positive for crack cocaine. (Badyna Aff. ¶ 13). These drugs had been partially hidden inside Gonzalez's buttocks. (Badyna Aff. ¶ 13).

C.    Khalil Williams' Miranda Warnings

At approximately 2:50 a.m. on the night of Williams' arrest, Detective Badyna sat down to interview Khalil Williams at the 40th Precinct. (Badyna Aff. ¶ 14). Detective Badyna read Williams his Miranda rights from a pre-printed NYPD form, a blank copy of which is attached as Exhibit B to the Badyna Affidavit. (Id.). Detective Badyna did not have a blank copy of that form at the time for Williams to sign, however, and thus, he read Williams his rights from a form that had been completed by a prior arrestee. (Id.). Williams verbally responded that he understood each of his rights and that he was willing to answer

9

questions. (Id.). Detective Badyna then recorded Williams'
consent on a separate sheet of paper, which is attached to the
Badyna Affidavit as Exhibit C. Specifically, Detective Badyna
wrote the following:

> I DET BADYNA READ KHALIL WILLIAMS HIS RIGHTS
> WHICH HE ANSEWERED [*sic*] YES TO THE QUESTIONS

(Id.). Detective Badyna then marked an "X" on the page with a
blank signature line. (Id.). Khalil Williams reviewed that
paragraph and signed on the blank line. (Badyna Aff. ¶ 14; Ex.
C).

 Khalil Williams then wrote out his own statement in his
own handwriting. (Badyna Aff. ¶ 15; Ex. C). After writing out
his statement, Williams signed the bottom of the page. (Id.).
Detective Badyna also signed the bottom of the page, along with a
fellow officer who was also present. (Id.).

 D. <u>Procedural History</u>

 On March 27, 2008, the Government filed a complaint in
the Southern District of New York, 08 Mag. 674, charging all four
defendants with robbery conspiracy, attempted robbery, and
related firearms charges, in violation of Title 18, United States
Code, Sections 924(c), 1951, and 2. The Complaint further
charged defendants Gonzalez and Williams with being felons in
possession of a firearm, in violation of Title 18, United States
Code, Section 922(g), and charged Gonzalez with distributing and
possessing with intent to distribute crack cocaine, in violation

of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).  On April 22, 2008, the defendants were indicted on those same charges in Indictment 08 Cr. 363 (BSJ).

### ARGUMENT

### THE DEFENDANTS' MOTIONS ARE MERITLESS

Defendants Gonzalez, Richardson and Williams bring various pretrial motions.  For the reasons set forth below, each of these motions lacks merit and should be denied without a hearing.

**I.    Defendants' Motions To Suppress Physical Evidence Recovered From the Honda Accord Should Be Denied Without a Hearing Because There Are No Disputed Issues of Material Facts and Their Claims Fail as a Matter of Law**

Richardson, Williams and Gonzalez move to suppress the physical evidence recovered from the Honda Accord, which consisted of, <u>inter alia</u>, a .45 caliber pistol, a starter pistol, duct tape, latex gloves, ski masks, laundry bags, a cell phone and a business card for Media Plaza, the store the defendants were intending to rob.

Each defendant argues that there was no probable cause to arrest him and that any physical evidence obtained as a result thereof must be suppressed as the fruits of an illegal arrest. (<u>See</u> Richardson Br. at 4; Williams Br. at 8-9; Gonzalez Br. at 3-4).  The defendants also argue that the detectives had no basis

11

to detain them, short of arresting them, because the detectives lacked "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" (<u>See</u> Williams Br. at 5, 8-9; Gonzalez Br. at 3-4).

To the contrary, however, the undisputed facts establish that the police had firmly-grounded reason to suspect that criminal activity was about to occur and to detain Gonzalez and the Honda Accord.  That suspicion quickly ripened into probable cause after the initial detention revealed additional evidence of a crime.  Because the police had probable cause to arrest the defendants and probable cause to search the Honda Accord, the warrantless search of the car was lawful under the "automobile exception."  The search of the car was also lawful as a search incident to a lawful arrest, and as an inventory search. Accordingly, the defendants' motions to suppress the evidence in the Honda Accord should be dismissed without a hearing.

### A.    Applicable Law

1.  <u>Warrantless Arrests</u>

A warrantless arrest such as the one in this case is fully justified if there is "probable cause when the defendant is put under arrest to believe that an offense has been or is being committed." <u>United States v. Cruz</u>, 834 F.2d 47, 50 (2d Cir. 1987).  Probable cause exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient

knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." <u>United States v. Patrick</u>, 899 F.2d 169, 171 (2d Cir. 1990) (citing, <u>inter alia</u>, <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76 (1949) and <u>Illinois v. Gates</u>, 462 U.S. 213, 230-32 (1983)).

Probable cause is a "commonsense, nontechnical" concept that is determined by "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996) (quotation omitted). As the Supreme Court explained in <u>Illinois v. Gates</u>:

> The process [of determining probable cause] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

462 U.S. at 231-32 (quotation omitted). As a result, "it is clear that only the probability, and not a <u>prima facie</u> showing, of criminal activity is the standard of probable cause." <u>Id.</u> at 235 (quotation omitted); <u>see also Maryland v. Pringle</u>, 540 U.S. 366, 371 (2003) ("The probable cause standard is incapable of precise definition or quantification into percentages because it deals

13

with probabilities . . . . We have stated . . . that [t]he
substance of all the definitions of probable cause is a
reasonable ground for belief of guilt.") (internal quotation
marks and citations omitted); Hill v. California, 401 U.S. 797,
804 (1971) ("[S]ufficient probability, not certainty, is the
touchstone of reasonableness under the Fourth Amendment.");
United States v. Cruz, 834 F.2d at 50 (to establish probable
cause, "it is not necessary to make a prima facie showing of
criminal activity or to demonstrate that it is more probable than
not that a crime has been or is being committed") (quotation
omitted).

        The presence or absence of probable cause must be
determined from the totality of the circumstances.  See Gates,
462 U.S. at 238. That determination is inherently fact-specific,
and does not lend itself to the formulation or application of
specific rules or tests.  Thus, this Court has explained that
"[p]robable cause is a flexible term. There is no rigid demand
that specific tests be satisfied." Tenenbaum v. Williams, 193
F.3d 581, 603 (2d Cir. 1999) (quotations omitted).  Moreover, the
information known to the officers at the time need not appear
sufficient to support a conviction, or even be admissible in
court.   See Adams v. Williams, 407 U.S. 143, 149 (1972)
("Probable cause does not require the same type of specific
evidence of each element of the offense as would be needed to

                              14

support a conviction. Rather, the court will evaluate generally the circumstances at the time of the arrest to decide if the officer had probable cause for his action.").

Moreover, "[p]robable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been." Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc); see also United States v. Scopo, 19 F.3d 777, 783-85 (2d Cir. 1994) (analysis of Fourth Amendment issues involves "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken.") (citations omitted); United States v. Ochs, 595 F.2d 1247, 1256 (2d Cir. 1979) ("[T]he test is what could lawfully be done, not what the policemen thought the source of their power to be."). Thus, as this Court explained in Scopo, so long as the arresting officer had probable cause to believe an offense was being committed, and "was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment." Scopo, 19 F.3d at 784.

Once law enforcement officers make a lawful arrest of the occupants of an automobile, the officers may search the car's passenger compartment, without a warrant, incident to that

15

arrest.  <u>Thornton v. United States</u>, 541 U.S. 615, 617 (2004); <u>New York v. Belton</u>, 453 U.S. 454 (1981).  This rule applies whether or not the officer first makes contact with the arrestee before or after he has exited the vehicle.  <u>Thornton</u>, 541 U.S. at 617. For example, <u>Thornton</u>, the defendant parked his car and exited before the officer reached him.  The officer thereafter approached the defendant and ultimately found drugs in his pocket.  The officer thereafter arrested the defendant and searched his car, where he found a gun under the driver's seat. The defendant challenged the search since he was not in the car at the time he first made contact with the police, but the Supreme Court found the search to be a lawful search incident to an arrest.  <u>Id.</u> at 617-18.

      2.  <u>Investigative Detentions</u>

It is also well-settled that, short of an arrest, a police officer may conduct a brief "investigative detention" or "<u>Terry</u> stop" by stopping a person to investigate possible criminal behavior, so long as at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur."  <u>United States v. Tehrani</u>, 49 F.3d 54, 58 (2d Cir. 1995) (citing <u>United States v. Glover</u>, 957 F.2d 1004, 1008 (2d Cir. 1992)). Reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational

inferences from those facts, that reasonably warrant suspicion."
United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

Just as law enforcement officers may detain individuals based on reasonable suspicion, they may also stop moving automobiles under Terry in order "to investigate a reasonable suspicion that its occupants are involved in criminal activity." United States v. Hensley, 469 U.S. 221, 226 (1985); Michigan v. Long, 463 U.S. 1032 (1983); United States v. Elmore, 483 F.3d 172, 178-183 (2d Cir. 2007) (analyzing whether officers had reasonable suspicion to conduct Terry stop of automobile and concluding that they did).

"Reasonable suspicion" is measured by an objective test, Glover, 957 F.2d at 1010, and reviewing the circumstances as a whole, not as discrete and separate facts.  United States v. Barlin, 686 F.2d 81, 86 (2d Cir. 1982).  In assessing whether an officer's suspicion was objectively reasonable, a court must consider the "totality of the circumstances."  United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000).  In that analysis, factors that by themselves suggest innocent conduct may add up to reasonable suspicion when viewed as a whole.  See United States v. Arvizu, 534 U.S. 266, 274-75 (2002); see also United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) ("Conduct as consistent with innocence as with guilt may form the basis for an

17

investigative stop where there is some indication of possible illicit activity."). Indeed, the Supreme Court has noted that a Terry stop may be lawful where the conduct that justifies it is ambiguous and susceptible of an innocent explanation. Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (noting that in Terry, the conduct that justified the stop - two individuals pacing back and forth in front of a store, peering into the window and periodically conferring - was ambiguous and susceptible of innocent explanation).

The test for reasonable suspicion is a "rather lenient" one, United States v. Santana, 485 F.2d 365, 368 (2d Cir. 1973), which the Second Circuit has described as "not a difficult one to satisfy," United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977). Under the "reasonable suspicion" standard, "the likelihood of criminal activity . . . falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. As the Supreme Court emphasized in Alabama v. White, 496 U.S. 325 (1990), "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause [and] can arise from information that is less reliable than that required to show probable cause." Id. at 330.

Moreover, reasonable suspicion is measured from the objective perspective of a trained and experienced law

enforcement officer.  <u>Cortez</u>, 449 U.S. at 418; <u>United States v.</u>
<u>Forero-Rincon</u>, 626 F.2d 218, 221-22 (2d Cir. 1980). "[T]he
'actual motivations of the individual officers involved' in the
stop 'play no role' in the analysis." <u>Holeman v. City of New</u>
<u>London</u>, 425 F.3d 184, 190 (2d Cir. 2005) (quoting <u>Whren v. United</u>
<u>States</u>, 517 U.S. 806, 813 (1996)).  The reasonable suspicion
analysis "does not deal with hard certainties, but with
probabilities," and properly takes into account that trained law
enforcement agents may make observations and draw conclusions
that go beyond the capacity of a lay person.  <u>Cortez</u>, 449 U.S. at
418; <u>United States v. Villegas</u>, 928 F.2d 512, 517 (2d Cir. 1991)
(suspicion reasonable if appears suspect to trained observer);
<u>see also</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 699-700 (1996)
(while ultimate review of reasonable suspicion determination is
<u>de</u> <u>novo</u>, deference should be given to the experience of the
police officers involved).

     "[N]ervous, evasive behavior is a pertinent factor in
determining reasonable suspicion." <u>Wardlow</u>, 528 U.S. at 124.
For example, in <u>Wardlow</u>, the Supreme Court found that the
defendant's unprovoked flight from police officers, coupled with
the fact that he was in an area known for heavy narcotics
trafficking, amounted to a reasonable, articulable suspicion that
criminal activity was afoot and thus justified the <u>Terry</u> stop.
<u>Id.</u> at 124-125.  In discussing Wardlow's unprovoked flight, the

Court noted that "[h]eadlong flight – where it occurs – is the
consummate act of evasion: It is not necessarily indicative of
wrongdoing, but it is certainly suggestive of such."  Id. at 124.

        Reasonable suspicion may also be based upon information
that the police receive from concerned citizens, confidential
informants, or anonymous tipsters, "so long as the tip bears
sufficient 'indicia of reliability'" or "is sufficiently
corroborated."  United States v. Elmore, 482 F.3d 172, 179 (2d
Cir. 2007).  If an informant's tip, standing alone, is
sufficiently reliable – because, for example, it establishes the
informant's basis of knowledge and veracity – it may constitute
reasonable suspicion.  Id. at 179; see Adams v. Williams, 407
U.S. 143, 145-47(1972) (upholding Terry stop based on an
uncorroborated tip from a known and previously reliable
informant).  Where a tip bears no indicia of reliability because
the tipster is anonymous, there may still be reasonable suspicion
so long as there is sufficient corroboration.  Id. at 180; see
Alabama v. White, 496 U.S. 325, 327-32 (1990) (finding reasonable
suspicion where anonymous tip predicting that a suspect would
leave a specific apartment at a specific time, in a specific car,
and drive to a specific location carrying drugs, was corroborated
by the police officers' observation of the suspect leaving the
identified apartment, getting in a car, and driving toward the
location the tipster had identified).  The Second Circuit has

20

recently stated that:

> it is useful to think of known reliability
> and corroboration as a sliding scale.  Where
> the informant is known from past practice to
> be reliable, as in <u>Williams</u> [407 U.S. 143],
> no corroboration will be required to support
> reasonable suspicion.  Where the informant is
> completely anonymous, as in <u>White</u> [496 U.S.
> 325], a significant amount of corroboration
> will be required.

<u>Elmore</u>, 482 F.3d at 181.

### 3.   Protective Sweep Pursuant to Terry Stop

After stopping a suspect pursuant to reasonable suspicion, an officer is permitted to conduct a protective search for weapons if the officer has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." <u>Terry</u>, 392 U.S. at 27.  The officer need not be absolutely certain that the suspect is armed; but rather, may conduct the protective search if a reasonably prudent man in the officer's position "would be warranted in the belief that his safety or that of others was in danger." <u>Id.</u>; <u>see also</u> <u>United States v. Alexander</u>, 907 F.2d 269, 272 (2d Cir. 1990) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists.").

When law enforcement officers conduct a <u>Terry</u> stop of a

21

suspect who is in an automobile, they may conduct a protective
sweep of the passenger compartment of the car if they reasonably
believe that the suspect is dangerous and may have immediate
access to a weapon.  Michigan v. Long, 463 U.S. at 1048-1051
(pursuant to Terry stop, search of passenger compartment of a
vehicle in the areas where weapons may be placed or hidden "is
permissible if the police officer possesses a reasonable belief
based on specific and articulable facts which, taken together
with the rational inferences from those facts, reasonable warrant
the officers in believing that the suspect is dangerous and the
suspect may gain immediate control of weapons") (internal
quotations omitted); Elmore, 482 F.3d at 178; United States v.
Hardy, 164 Fed. Appx. 189, 2006 WL 266614 (2d Cir. Feb. 3, 2006)
(Summary Order) (where Terry stop was supported by reasonable
suspicion, canine sniff of vehicle and subsequent search of
vehicle's interior was not unreasonable).

### 4.   Warrantless Searches of Automobiles

Separate from law enforcement officers' ability to
briefly detain an automobile and conduct a protective sweep,
warrantless searches of automobiles are sometimes authorized.  In
particular, law enforcement officers may conduct a warrantless
search of an automobile when they have probable cause to believe
it contains contraband or evidence of criminal activity.  The
"automobile exception" to the warrant requirement stems both from

22

the reduced expectation of privacy due to the "configuration, use, and regulation of automobiles," Arkansas v. Sanders, 442 U.S. 753, 761 (1979), overruled on other grounds California v. Acevedo, 500 U.S. 565 (1999), and from the inherent mobility of vehicles, which often creates exigent circumstances that make obtaining a warrant impractical.  Pennsylvania v. Labron, 518 U.S. 938 (1996) (per curiam).  Whether probable cause exists requires "a practical, common-sense decision, whether given all the circumstances . . . there is a fair probability that contraband . . . will be found in a particular place. . . . [O]nly a probability or substantial chance of criminal activity, not an actual showing of such activity is necessary."  United States v. Harwood, 998 F.2d 91, 96 (2d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 and 243 n.13 (1983)) (internal quotation marks omitted).

Under the automobile exception, so long as the vehicle is "readily mobile and probable cause exists to believe it contains contraband," there is no separate exigency requirement. Maryland v. Dyson, 527 U.S. 465, 467 (1999); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam) (same).  Thus, a vehicle search may be performed after the exigent circumstances lapse, so long as the police could have legitimately searched the vehicle at some point.  United States v. Johns, 469 U.S. 478, 483-487 (1985) (search of car at customs headquarters after three

23

days was reasonable because vehicle could have been searched immediately and "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure"); <u>Michigan v. Thomas</u>, 458 U.S. 259, 261 (1982) ("when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody"); <u>Chambers v. Maroney</u>, 399 U.S. 42, 52 & n.10 (1970) (search of car after removal to police station reasonable because probable cause and exigent circumstances existed immediately after defendants were arrested), overruled on other grounds <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993); <u>see also</u> <u>United States v. Harwood</u>, 998 F.2d 91, 97 (2d Cir. 1993) (rejecting argument that search of van at police command post several hours after seizure rendered search illegal, where probable cause existed to justify search); <u>United States v. Paulino</u>, 850 F.2d 93, 96 (2d Cir. 1988) ("courts applying the automobile exception are concerned only with whether the search involves an automobile . . . If the space searched meets this criteria then provided probable cause exists, the inquiry ends"); <u>see also</u> <u>United States v. Parrado</u>, 911 F.2d 1567 (11th Cir. 1990) (rejecting claim that automobile exception search no longer warranted after defendant was arrested and exigent circumstances ceased to exist).

24

The scope of a warrantless search of a car conducted under the automobile exception extends as far as "a magistrate could legitimately authorize by warrant." United States v. Ross, 456 U.S. 798, 825 (1982).  The police may search every part of a vehicle and containers within the vehicle that may conceal the object of the search so long as they have a generalized belief that the car contains contraband somewhere inside.  Id.; see, e.g. Harwood, 998 F.2d at 97 (warrantless search of door panels permissible as LSD in blotter form can be stashed anywhere in vehicle).

5.   Inventory Searches

When law enforcement officers seize vehicles, they regularly perform inventory searches.  See, e.g., South Dakota v. Opperman, 428 U.S. 364, 376 (1976) (holding admissible evidence discovered during the impoundment of an illegally parked automobile).  Such searches are constitutional under the Fourth Amendment because they "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987).  "The inventory search constitutes a well-defined exception to the warrant requirement." United States v. Mendez, 315 F.3d 132 (2d Cir. 2002) (quoting Lafayette, 462 U.S. at 643).

25

As the Second Circuit recently stated in <u>Mendez</u>,

> Of course, the right to [make an] inventory . . . does not carry in its wake unlimited discretion. Under the inventory search doctrine, we have held that "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria . . . or established routine. The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices.

315 F.3d at 137 (internal quotations and citations omitted).

## B.  Discussion

Applying these principles, the defendants' motions to suppress the physical evidence recovered from the car must be denied.  The basic facts leading to the defendants' detentions and arrests are undisputed.  Each of the defendants submitted a factual affidavit in connection with his motion and yet none of the defendants materially challenged the facts as set forth in the Complaint.  It is clear, based on these undisputed facts, that law enforcement officers had a legally sufficient and objective basis to stop each defendant, including those in the Honda Accord, and then to arrest these individuals.  Moreover, law enforcement officers had probable cause to believe that their car contained contraband or evidence of criminal activity.  As such, the search and discovery of the evidence in the Honda Accord was legally authorized, the evidence should not be suppressed, and no hearing is necessary.

26

At the outset, the police officers who approached Gonzalez after he looked into the detective's car clearly had reasonable suspicion to believe that criminal activity was afoot. The following support that conclusion:

- the tip the NYPD had received from a source who had provided reliable information in the past that several individuals were planning an armed robbery that evening at an electronics store located at 20 Bruckner Boulevard in the Bronx, New York (Badyna Aff. ¶ 3);

- the tipster's information that these individuals would be arriving in a dark-colored car (Badyna Aff. ¶ 3);

- the fact that there is an electronics store – Media Plaza – located at 20 Bruckner Boulevard, Bronx, New York (Badyna Aff. ¶ 4);

- the fact that, at the precise location identified by the tipster, and on the same evening identified, more than one individual arrived in a dark-colored Honda Accord (Badyna Aff. ¶¶ 5-6);

- the "casing" of the store that Gonzalez did as he twice exited from the back seat of the Honda Accord (Compl. ¶¶ 8(c) and 8(e); Badyna Aff. ¶¶ 6-9);

- the movements of the car, specifically including the slow movement past Media Plaza upon its arrival, and then the backwards movement in order to park directly across from the specific store that the police suspected might be the target of the robbery (Compl. ¶¶ 8(b) and 8(d); Badyna Aff.

27

¶¶ 5, 7);

- Gonzalez's sudden change of direction when, as he was walking toward Media Plaza, he veered in the direction of the detectives' car, walked around the front, and peered inside the front window; (Badyna Aff. ¶ 9);

- Gonzalez's immediate reaction upon seeing the undercover NYPD officers to leave the area quickly, rather than return to his own car (Compl. ¶ 8(e); Badyna Aff. ¶ 9); and

- the fact that Gonzalez's hands appeared peculiar when he looked into the front window of the law enforcement vehicle (Badyna Aff. ¶ 10).

These facts amply demonstrate that the police had a reasonable suspicion to believe that a crime was about to take place and criminal activity was afoot.[3]  Indeed, Gonzalez' action in "casing" the store, by itself, may constitute reasonable suspicion.  See, e.g., Terry, 392 U.S. at 5-6, 28-30 (two individuals packing back and forth in front of store, peering into the window and periodically conferring, constituted reasonable suspicion).  Similarly, Gonzalez' "evasive" behavior when, after he observed Detective Badyna, he immediately turned and swiftly walked away from the area and the car in which he had arrived, could raise a reasonable suspicion.  Wardlow, 528 U.S. at 124.  There can be no question that when all of these

---

[3] Even if some of these facts were disputed, those which are not in dispute nonetheless satisfy the reasonable suspicion standard.

28

circumstances are taken together – the tip from a reliable person, the predictive information provided by the tipster that was corroborated by the officers, the "casing," the evasive behavior, and the strange-looking hands – these facts and circumstances overwhelmingly demonstrate that the police officers had reasonable suspicion the criminal activity was afoot with respect to Gonzalez and the occupants in the car.  As such, the police officers acted well within their authority when they conducted a <u>Terry</u> stop of both Gonzalez and the Honda Accord.

Within seconds of the <u>Terry</u> stop of Gonzalez, the facts developed and ripened into probable cause to support the arrests of the defendants and the complete search of the Honda Accord. In particular, when Detective Badyna approached Gonzalez, he confirmed that the reason Gonzalez's hands looked strange was because Gonzalez was wearing rubber gloves as he walked down this Bronx street after 8:00 p.m. at night.  (Compl. ¶ 8(e); Badyna Aff.  ¶ 10).  Gonzalez himself does not and, indeed, cannot dispute that he was wearing latex gloves at the time (Gonzalez Aff. ¶ 2; Gonzalez Br. ¶ 18), especially in light of the photograph of his gloved hands at the time of his arrest.  (<u>See</u> Badyna Aff. ¶ 10 and Ex. A).  The fact that Gonzalez was wearing latex gloves at that time, when viewed under the totality of circumstances with all of the other factors described above, amounted to probable cause to believe that Gonzalez was

29

committing a crime and thus, to arrest him.

As if that were not enough, immediately after detaining Gonzalez, the officers conducted a <u>Terry</u> stop and protective sweep of the Honda Accord, and discovered additional equipment that could be used to commit a robbery. The discovery of those items supported probable cause not only to arrest Gonzalez, but also to arrest the other occupants of the Honda Accord and to fully search that car.[4] Specifically, police officers found Williams in the front passenger seat with a roll of duct tape in his lap and a pair of latex gloves, a fact which Williams has not disputed. (Compl. ¶ 8(f); Williams Aff.). Officers further observed additional latex gloves, ski masks, and laundry bags strewn inside the Honda Accord, among other items. (Badyna Aff. ¶ 11; Compl. ¶ 8(f)).

This evidence, which was in plain view (Compl. ¶ 8(f)), clearly gave the officers probable cause to believe that car may contain additional contraband or evidence of criminal activity and thus, could conduct a more thorough search under the automobile exception. <u>See</u>, <u>e.g.</u> <u>Maryland v. Dyson</u>, 527 U.S. 465, 467 (1999); <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996) (per

---

[4] Even if the officers lacked probable cause to arrest Gonzalez at the precise moment they confirmed that he was wearing rubber gloves, they clearly had probable cause once the observed the duct tape, ski masks, rubber gloves, and laundry bags inside the Honda Accord following the <u>Terry</u> stop. <u>See</u> <u>e.g.</u>, <u>United States v. Heath</u>, 455 F.3d 52, 55-57 (2d Cir. 2006).

curiam).[5]

Once the police had probable cause to search the Honda Accord, they were not required to complete the search at that time. See Michigan v. Thomas, 458 U.S. 259, 261 (1982) ("when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody"); Harwood, 998 F.2d at 97 (rejecting argument that search of van at police command post several hours after seizure rendered search illegal, where probable cause existed to justify search). Moreover, the police may search every part of the vehicle. See United States v. Ross, 456 U.S. 798, 825 (1982) (police may search every part of a vehicle and containers within the vehicle that may conceal the object of the search if they have a generalized belief that the vehicle contains contraband somewhere inside). Accordingly, because there was probable cause to believe that the Honda Accord contained contraband or evidence of a crime, the search was lawful regardless of when it was conducted.

Finally, the search of the Honda Accord was a lawful

---

[5] In addition, the police officers could have lawfully searched the passenger compartment of the Honda Accord – including the area under the driver's seat – incident to the arrest of the occupants. See Thornton, 541 U.S. at 617.

inventory search.  While the Court need not reach this issue since there was probable cause to arrest the occupants of the Honda Accord and probable cause to search the car under the automobile exception, the Government's evidence, if put to the test, would demonstrate that the search of the Honda Accord was in compliance with specific, standardized procedures employed by the NYPD for conducting inventory searches.

For the reasons set forth above, the defendants' motion to suppress the evidence recovered from the Honda Accord should be denied without a hearing.

**II.      Williams' Motion To Suppress His Post-Arrest Statement Should Be Denied Without A Hearing Because There Are No Disputed Issues of Material Facts**

Williams also moves to suppress the handwritten statement he gave to law enforcement officers following his arrest and after a police officer advised him of his <u>Miranda</u> rights.  Williams does not dispute that at the top of his handwritten statement Detective Badyna wrote the following:

> I DET BADYNA READ KHALIL WILLIAMS HIS RIGHTS
> WHICH HE ANSEWERED [*sic*] YES TO THE QUESTIONS

(Badyna Aff. ¶ 14; Ex. C).  Nor does Williams dispute that he signed his acknowledgment of that statement.  (Badyna Aff. ¶ 14; Ex. C; Williams Br. at 11).  Nonetheless, he argues that "[n]o Miranda rights card was generated for Mr. Williams setting forth

the rights that he allegedly waived," and there is no indication
as to <u>what rights</u> Williams was read and thereafter waived.
(Williams Br. at 11).  However, these bare allegations have no
foundation in the record, specifically including the affidavit
Williams submitted with his own motion.  Accordingly, Williams
has failed to raise any factual dispute on this issue and his
motion should be denied as a matter of law.

### A.    Applicable Law

It is well settled that a suspect must be advised of
the rights specified in <u>Miranda v. Arizona</u>, 384 U.S. 436, 479
(1966), before he may be subject to custodial interrogation.
Having been so advised, a suspect may waive his <u>Miranda</u> rights
and agree to be interviewed.  To prove a valid waiver, the
Government must show that the waiver was voluntary, and that the
defendant was aware of the right being waived and the
consequences of waiving that right.  <u>See</u> <u>United States v. Jaswal</u>,
47 F.3d 539, 542 (2d Cir. 1995).  In determining whether a
confession is the product of coercion, courts must consider "the
totality of all the surrounding circumstances, including the
accused's characteristics, the conditions of interrogation, and
the conduct of law enforcement officials." <u>United States v.
Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991); <u>United States v. Bye</u>,
919 F.2d 6, 8-9 (2d Cir. 1990) (test is whether the waiver was

the "product of an essentially free and unconstrained choice,"
and the reviewing court must consider totality of the surrounding
circumstances).  The Government must prove waiver by a
preponderance of the evidence.  See Colorado v. Connelly, 479
U.S. 157, 168 (1986).

A defendant seeking the suppression of evidence is not
automatically entitled to an evidentiary hearing on his claim,
but must first "state sufficient facts which, if proven, would
[require] the granting of the relief requested."  United States
v. Kornblau, 586 F. Supp. 614, 621 (S.D.N.Y. 1984) (internal
quotation and citation omitted) (alteration in original); see
United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998); United
States v. Ortiz, 99 Cr. 532 (DC), 1999 WL 1095592, at *1
(S.D.N.Y. 1999).  To meet this burden, a defendant must present
his claim through an affidavit of an individual with personal
knowledge of the relevant facts.  See United States v. Gillette,
383 F.2d 843, 848-49 (2d Cir. 1967); United States v. Viscioso,
711 F. Supp. 740, 745 (S.D.N.Y. 1989).  In such an affidavit, the
defendant must show "that disputed issues of material fact exist
before an evidentiary hearing is required."  Viscioso, 711 F.
Supp. at 745 (internal quotation and citation omitted).

34

**B.    Discussion**

Williams' argument should be rejected without a hearing.  The evidence clearly demonstrates that Detective Badyna advised Williams of his Miranda rights, which Detective Badyna then recorded in a written summary that Williams signed in acknowledgment that he was knowingly waiving those rights. (Badyna Aff. ¶ 14; Ex. C).

Williams has not disputed any of those facts.  Indeed, he has submitted an affidavit that addresses other facts, but provides no support for his attorney's baseless insinuation that it is not clear what rights Williams was advised of.  (See Williams Br. at 11).  This is simply insufficient to create a material issue of fact.

Rather, Williams' own hand-written statement proves that he was read his rights and that he waived them, as further confirmed by Detective Badyna's affidavit.  That affidavit further establishes that the rights referred to in Williams' handwritten statement were his Miranda rights.

The Government has therefore demonstrated by more than a preponderance of the evidence that Williams was advised of his Miranda rights and he waived them.  As such, Williams' motion to suppress his post-arrest statement should be denied without a hearing.

III.    **Gonzalez's Motion to Suppress The Crack Cocaine Recovered From His Person Should Be Denied Without a Hearing Because There Was Reasonable Suspicion To Conduct The Search**

Gonzalez further moves to suppress the crack cocaine that was recovered during an alleged cavity search of his person "as part of a routine safety search." (Gonzalez Br. at 3, quoting Complaint at ¶ 8(g)). He asserts that law enforcement officers cannot conduct body cavity searches of pre-trial detainees absent reasonable suspicion that the detainee is carrying contraband or weapons. (Id. at 8). He then argues that, in this case, there is no indication in the Complaint or in discovery that the law enforcement officers had reasonable suspicion to believe that Gonzalez had contraband or narcotics secreted inside him, and thus, the search was unlawful. An analysis of even the most basic facts surrounding Gonzalez's arrest, however, amply supports the officers' reasonable suspicion that Gonzalez may have been secreting contraband on his person after his arrest. Accordingly, Gonzalez's motion should be denied without a hearing.

A.    **Applicable Law**

In Bell v. Wolfish, the Supreme Court recognized that the "Fourth Amendment prohibits only unreasonable searches." 441 U.S. 520, 558 (1979). In Bell, the Supreme Court addressed the reasonableness of strip searches of inmates following contact

36

visits, and the Court held that courts must apply a "test of reasonableness" in analyzing any such search. Id. at 559. Specifically, the Supreme Court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place

Id.

In Weber v. Dell, 804 F.2d 796 (2d Cir. 1986), the Second Circuit analyzed the reasonableness of strip searches and visual body cavity searches of pretrial detainees arrested on misdemeanor charges, and held that:

> [T]he Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular circumstances of the arrestee, and/or the circumstances of the arrest.

Id. at 802. The Second Circuit referenced Weber in Shain v. Ellison, 273 F.3d 56 (2d Cir. 2001), where the Court, in analyzing a claim of qualified immunity, was required

> to determine whether it was clearly established in July 1995 that corrections officers in a local correctional facility could not perform a strip search including a

37

non-intrusive examination of body cavities on
an individual arraigned on misdemeanor charges
unless the officers had reasonable suspicion
that the individual possessed contraband or
weapons.  We hold that after this court's
decisions in <u>Wachtler v. county of Herkimer</u>,
35 F.3d 77 (2d Cir. 1994), <u>Walsh v. Franco</u>,
849 F.2d 66 (2d Cir. 1988), and <u>Weber v. Dell</u>,
804 F.2d 796 (2d Cir. 1986), no law
enforcement officers could have believed that
it was permissible to perform such a search
absent individualized reasonable suspicion.

<u>Id.</u> at 59.  <u>Shain</u> too pertained to strip searches of arrestees.

The Second Circuit, and courts within this Circuit,
have addressed the legality of strip searches on a number of
occasions since <u>Bell</u>, <u>Weber</u>, and <u>Shain</u>.  In doing so, courts look
to whether the search was reasonable and was supported by
reasonable or particularized suspicion.  <u>See</u>, <u>e.g.</u>, <u>N.G. v.
Connecticut</u>, 382 F.3d 225, 239 (2d Cir. 2004) (discussing the
"special needs" of government in maintaining security in
detention facilities and similar settings and the requirement of
individualized suspicion for all strip searches); <u>Hartline v.
Gallo</u>, No. 03 Civ. 1974, 2006 WL 2850609 (E.D.N.Y. Sept. 30,
2006) (Hurley, S.J.) (quoting <u>Bell</u> factors on which the
"reasonableness of a strip search turned"); <u>Bradley v. Village of
Greenwood Lake</u>, 376 F. Supp. 2d 528 (S.D.N.Y. 2005) (McMahon, J.)
("The Fourth Amendment standard for a strip search is
"individualized reasonable suspicion.") (internal quotations
omitted); <u>Flores v. City of Mount Vernon</u>, 41 F. Supp. 2d 439
(S.D.N.Y. 1999) (requiring individualized suspicion of secreted

38

contraband or weapons for strip search committed during execution
of search warrant).

The factors that courts look to in assessing whether
there was a particularized or reasonable suspicion include:

- the nature of the crime charged; see Campbell v.
  Miller, 499 F.3d 711, 718 (7th Cir. 2007) (person
  arrested for narcotics possession, as opposed to
  someone stopped for speeding, is "the kind of
  crime . . . that might give rise to a reasonable
  belief that [an arrestee] was concealing an item
  in a body cavity") (internal quotations omitted));
  Bradley, 376 F. Supp. 2d at 535-36;

- the manner of the search, including where it was
  conducted, see Campbell, 499 F.3d at 718-719
  (quoting Bell, 441 U.S. at 559) (search involving
  public nudity and exposure of intimate body parts
  was far less reasonable than search in private
  place like a lock-up facility), and how intrusive
  it was, see Kramer v. New York City Police
  Department, No. 04 Civ. 106, 2004 WL 2429811
  (S.D.N.Y. Nov. 1, 2004) (Baer, J.) (upholding
  strip search of arrestee charged with attempted
  murder by poison, where arrestee asked to use the
  bathroom twice and where the scope of the search
  was minimal and only required her to show her
  "derriere");

- the circumstances of the arrest, including whether
  the arrestee was wearing multiple layers of loose-
  fitting clothing, as opposed to tight clothing;
  Hartline, 2006 WL 2850609 at *6; United States v.
  Asbury, 586 F.2d 973, 976-77 (2d Cir. 1978)
  (considering losse-fitting clothing and other
  incidences of the arrest as factors creating a
  reasonable suspicion);

- whether the arrestee acted in an evasive manner
  and/or had attempted to hide or discard something;
  Campbell, 499 F.3d at 718; Bradley, 376 F. Supp.

2d at 535-36; and

- whether the arrestee is stopped/arrested in close proximately to contraband or narcotics; <u>Hartline</u>, 2006 WL 2850609, at *6; <u>Elk v. Townsend</u>, 839 F. Supp. 1047 (S.D.N.Y. 1993).

So, for example, in <u>Bradley</u>, Judge McMahon found that a strip search was lawful where the arrestee came to the attention of the police by a tip that the arrestee had heroin that he had attempted to sell to minors and was seeking to distribute imminently; the arrestee fled when the officers approached and was outside of their sight for several minutes; and when apprehended, the arrestee had no weapons or drugs on him. 376 F. Supp.2d 518. In <u>Elk</u>, Judge Broderick found that a strip search was lawful where the arrestee was present in a car that smelled strongly of marijuana and where marijuana was found in a container near the arrestee and on another person in the car. <u>Id.</u> at 1052. In <u>Hartline</u>, Judge Hurley concluded that, where the arrestee was stopped alone in a vehicle in which marijuana seeds, paraphernalia, and roaches were strewn, and where she was "wearing multiple layers of loose-fitting clothing at the time of her arrest," the strip search was supported by reasonable suspicion. <u>Hartline</u>, 2006 WL 2850609, at *6.

## B.    Discussion

In this case, applying the various factors that courts look to in evaluating the legality of a strip search, it is clear that the officers had a reasonable or particularized suspicion to conduct a strip search of Gonzalez.  First, Gonzalez was arrested and charged with the felony offense of robbery.  Second, based on information that Detective Badyna received from a source who had provided reliable information in the past, and which information was corroborated by the events that the police witnessed on March 25, 2008, the robbers were likely to be carrying weapons. (Badyna Aff. ¶ 3).  Yet, by the time that Detective Badyna and others conducted the strip search of Gonzalez, no weapons had been recovered from Gonzalez or his co-defendants or from their Honda Accord.  Moreover, the initial search of the car that Gonzalez had arrived in revealed, among other things, ski masks, duct tape, and latex gloves.  (Badyna Aff. ¶ 11).  Not only had Gonzalez been in close proximity to all of these items – but the presence of these items in the Honda Accord also supported the inference that the robbery was going to be committed by violence and force.

In addition, Gonzalez is a large man and at the time of his arrest, he was wearing loose-fitting clothing. (Badyna Aff. ¶ 10).  Detective Badyna knew, based on his more than two decades of experience as a police officer, that there are numerous places

41

in or on his body where Gonzalez may have hidden a weapon or
other contraband.  (Badyna Aff. ¶ 12).  Indeed, Detective Badyna
knows from experience that felony arrestees sometimes hide
weapons inside of them or on their person, and such weapons (or
contraband) are not always detected during a pat-down search.
(Id.).

Also, the strip search of Gonzalez was limited in scope
and was conducted in a private place.  In particular, upon
pulling Gonzalez' pants down, Detective Badyna immediately
observed a piece of a plastic bag protruding from Gonzalez'
buttocks.  (Badyna Aff. ¶ 13).  Detective Badyna removed that
bag, which contained approximately 23 bags of a substance that
field tested positive for crack cocaine.  (Id.)  These drugs had
been partially hidden inside Gonzalez's buttocks.  (Id.)  The
search occurred in the bathroom of the precinct and the only
people present were Gonzalez and other law enforcement officers.
(Id.).

These facts, taken together and considered under the
totality of the circumstances, demonstrate that the police
officers had reasonable suspicion to believe that Gonzalez was
concealing weapons or contraband on his person, and that the
search of Gonzalez was reasonable under the Fourth Amendment.
Because these facts are not presently disputed, the Court should
deny Gonzalez' motion without a hearing.

42

IV.     **Richardson's Motion to Dismiss the Indictment**
        **For Insufficient Evidence Should Be Denied**

Richardson also moves to dismiss the Indictment based on insufficient evidence to sustain the charges against him. (Richardson Br. at 4).  He argues that even assuming that the evidence supports a robbery conspiracy charge against some of the defendants, Richardson's only connection to the charges is his presence inside the car.  (Id.).  Moreover, Richardson argues that the attempted robbery charge contained in Count Two of the Indictment is deficient on its face, and therefore must be dismissed, because the defendants' actions did not approach that of an "attempt."  (Id. at 5).

Richardson's argument must be rejected.  The question of whether the Government has sufficient evidence to convict the defendant is properly a factual matter for the jury and is not appropriate for resolution on a motion to dismiss.

It is well-settled that an indictment that is valid on its face may not be dismissed on the ground that it is based on inadequate or insufficient evidence.  See United States v. Casamento, 887 F.2d at 1141, 1182 (2d Cir. 1989) ("an indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence."); United States v. Butler, S1 04 Cr. 340 (GEL), 2004 WL 2516672 (S.D.N.Y. Nov. 4, 2004) ("[I]t is hornbook law that a federal defendant may not challenge a

43

facially-valid indictment . . . on the ground that it is based on insufficient evidence."); <u>United States v. Elson</u>, 968 F. Supp. 900, 905 (S.D.N.Y. 1997) (citing, among other cases, <u>United States v. Williams</u>, 504 U.S. 36, 54 (1992)).  A challenge to the sufficiency of the evidence does not provide a basis for dismissal or a pretrial hearing because the Government is not required to demonstrate the sufficiency of its proof until the close of its case-in-chief at trial.  <u>Elson</u>, 968 F. Supp. at 905; <u>see also</u> <u>United States v. Alfonso</u>, 143 F.3d 772, 776-77 (2d Cir. 1998) (holding that district court erred in dismissing the indictment based on sufficiency of evidence); <u>United States v. Labate</u>, S1 00 Cr. 632 (WHP), 2001 WL 533714, at *10 (S.D.N.Y. May 18, 2001) ("Based on the role assumed by a faithful grand jury in the accusatory process, an indictment, if valid on its face, is enough to call for trial of the charges on the merits.") (citations omitted).

A defendant must wait until the Government has presented its case before mounting a challenge to the sufficiency of the evidence against him.  <u>See</u> <u>United States v. Gambino</u>, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992), <u>aff'd</u>, 17 F.3d 572 (2d Cir. 1994) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.  Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary

44

sufficiency."); <u>United States v. Massino</u>, 605 F. Supp. 1565, 1581 (S.D.N.Y. 1985), <u>rev'd on other grounds</u>, 784 F.2d 153 (2d Cir. 1986) ("A motion to dismiss for insufficient evidence can be decided only at trial, after the government has been put to its test, not before trial, based merely on assumptions of what the government's proof will be.").

To the extent that the defendant claims that the Indictment here is facially invalid because it does not allege any facts showing that the defendant had any connection with the evidence found in the car, other than his mere presence, or that the indictment does not allege any affirmative actions taken by Richardson or any of his co-defendants that might constitute an attempt to commit a robbery, he is simply incorrect. "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974). As the Second Circuit repeatedly has held, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." <u>United States v. Stavroulakis</u>, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted); <u>see also</u> <u>United States v. LaSpina</u>, 299 F.3d 165, 177 (2d Cir.

45

2002).

Here, the Indictment tracks the language of the various offenses charged. Richardson is named in Counts One through Three, which charge him with, respectively, conspiring to commit a Hobbs Act robbery, attempting to commit a Hobbs Act robbery, and using, carrying and possessing a firearm, and aiding and abetting such, during and in relation to the robbery conspiracy charged in Count One. These charges specifically allege that Richardson participated in these crimes, with others, and the charges track the relevant statutes and specify the date and location of the charged crimes. Nothing more is required by the law. The Government is not required to allege any facts showing the various acts Richardson or his co-defendants took in furtherance of those charged crimes. See, e.g., United States v. Veliz, 03 Cr. 1473 (GEL), 2004 WL 964005, at *1 (S.D.N.Y. May 5, 2004) ("brief and conclusory" indictment that tracks statute and gives time and place of crime is sufficient).

The Government's proof will be put to test at trial, and Richardson may challenge the sufficiency of the evidence after the Government has presented its case-in-chief. Until that time, Richardson is not entitled to dismissal of the Indictment, nor is he entitled to a sneak preview of the Government's evidence against him.

**V.**      **Richardson's Motion to Disclose Grand Jury Minutes Should Be Denied**

In addition to arguing that the Indictment should be dismissed for insufficiency of the evidence, Richardson also argues that due to the insufficient evidence, the Court should order disclosure of the grand jury minutes and inspect them <u>in camera</u>.  (Richardson Br. at 5-6).  Richardson argues that based on the allegations in the Complaint, "it would appear . . . that no specific evidence could have been presented against Mr. Richardson."  (<u>Id.</u> at 6).  He surmises that the only way that the grand jury could return an indictment against him is if the grand jury was improperly instructed on the law and it imputed the arguably suspicious conduct of Gonzalez to the other defendants. (<u>Id.</u> at 6).

Richardson's arguments are unavailing.  First, as explained above, Richardson is charged in a facially valid Indictment, which is not subject to challenge on the basis of inadequate or insufficient evidence.  Second, the defendant's speculative and conclusory claims of insufficient evidence and error in the grand jury do not establish that he has a "particularized need" for grand jury materials that outweighs the Government's compelling interest in secrecy.

**A.    Applicable Law**

47

Matters occurring before the grand jury are typically secret. <u>United States v. Johnson</u>, 319 U.S. 503, 513 (1943). The secrecy of the grand jury proceeding is central to our criminal justice system, because "[t]he grand jury as a public institutional serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow." <u>United States v. Procter & Gamble</u>, 356 U.S. 677, 682 (1958). If defendants could routinely gain access to grand jury minutes based on hollow or speculative allegations, the functioning of the criminal justice system would be severely compromised. <u>See</u> <u>Costello v. United States</u>, 350 U.S. 359 (1956)("If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed."). As such, a defendant seeking disclosure of grand jury matters under Rule 6(e) bears a heavy burden.

In the present case, Richardson seeks disclosure pursuant to Rule 6(e)(3)(E)(ii), which authorizes the court, in its discretion, to disclose grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." (Richardson Br. at 5-6). To prevail under this rule, Richardson must demonstrate that "'a particularized need' exists for the [grand jury] minutes which outweighs the policy of

48

secrecy." Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400 (1959); United States v. Sells Engineering, 463 U.S. 418, 443 (1983) ("We have consistently construed [Rule 6(e)] . . . to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted."). The Second Circuit has embraced this heavy burden, see United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1990) (a defendant seeking disclosure of grand jury minutes "because of a matter that occurred before the grand jury" must "show a particularized need that outweighs the government's strong interest in secrecy"), and this burden applies whether the defendant requests disclosure of grand jury minutes to himself or to the court in camera.  See United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990) ("[g]rand jury proceedings carry a presumption of regularity" and in camera "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct") (internal quotations omitted); United States v. Ruiz, 702 F. Supp. 1066, 1073 (S.D.N.Y. 1989) (requiring a showing of particularized need where defendant requests in camera review of grand jury minutes, aff'd., 894 F.2d 501 (2d Cir. 1990); United States v. Leonelli, 428 F. Supp. 880, 883 (S.D.N.Y. 1977) (concerning defendant's request for in camera inspection of grand jury minutes, stating that "[t]he nature of the compelling need to justify pre-trial disclosure of grand jury minutes has been

properly stated as 'a gross and prejudicial irregularity influencing the grand jury,'") (internal quotation omitted)).

Thus, district courts in this Circuit routinely deny requests such as this one.  For example, in <u>United States v. Brown</u>, 1995 WL 387698 (S.D.N.Y. June 30, 1995), the defendant moved to inspect the grand jury minutes, alleging that the grand jury was not apprised of all relevant witnesses, that the evidence failed to establish the crime, and that it was "not inconceivable" that there were "inherent defects" in the manner of which the indictment was issued.  <u>Id.</u> at *6-9.  The court rejected the motion because the speculative allegations did not constitute a particularized need for grand jury minutes.  <u>Id.</u>; <u>see also</u> <u>United States v. Kalevas</u>, 622 F. Supp. 1523, 1525 (S.D.N.Y. 1985) (Weinfeld, J.) (rejecting defendant's request for <u>in camera</u> inspection of grand jury materials where there was not the "slightest evidential support" for defendant's claims of misconduct or inadequate evidence); <u>United States v. Abrams</u>, 539 F. Supp. 378, 389 (S.D.N.Y. 1982) (defendant must base request for <u>in camera</u> inspection of grand jury minutes on more than "pure speculation"); <u>United States v. Leonelli</u>, 428 F. Supp. 880, 883 (S.D.N.Y. 1977) (defendant's motion for inspection of the grand jury minutes, which was supported by sworn affidavit alleging that the grand jury had been misled and presented with lies and hearsay evidence, was denied because the "unsupported

generalities" fell far short of establishing that denial would result in prejudice or an injustice); <u>United States v. Quinn</u>, 116 F. Supp. 802, 804 (E.D.N.Y. 1953)("It is true that a court may examine the proceedings of a grand jury but the requirement of Rule 6(e) therefor is not satisfied by the mere statement in the instant application that certain proof (that referred to in the indictment) is all that the Government has.").

### B. Discussion

In the present case, Richardson's claims of insufficient evidence and grand jury misuse or error are speculative, conclusory, unsupported, and fall short of demonstrating a "particularized need" that "outweighs the government's strong interest in secrecy," <u>Moten</u>, 582 F.2d at 662, or a "gross and prejudicial irregularity influencing the grand jury." <u>Leonelli</u>, 428 F. Supp. at 883. Indeed, Richardson concedes that there is no factual support for this allegation, and has claimed that "<u>it is believed</u> that the evidence before the Grand Jury was so lacking in sufficiency and <u>very possibly</u> resulted from incorrect jury instructions." (Richardson Br. at 6).

Accordingly, because Richardson's claims are speculative and unsubstantiated, he has failed to demonstrate a particularized need for <u>in camera</u> inspection of the grand jury

minutes to the Court, and his motion for disclosure and dismissal of the Indictment should be denied.

**VI.      Gonzalez' Motion for Severance or a Bifurcated Trial on Count VI Should Be Denied As Premature**

Gonzalez also requests that the Court sever Count VI of the Indictment, or in the alternative, grant him a bifurcated trial on Count VI. Count VI charges Gonzalez with being a felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). Gonzalez argues that evidence of his prior felony conviction – which is an element of the crime charged under Section 922(g) – will significantly prejudice the jury that is evaluating evidence on the remaining counts. Thus, he argues that under United States v. Jones, 16 F.3d 487 (2d Cir. 1994), he should receive a bifurcated trial on the 922(g) charge at a minimum.

The Court should defer ruling on this motion at this time because should Gonzalez proceed to trial, the Government intends to seek to introduce evidence of Gonzalez's prior conviction under Federal Rule of Evidence 404(b). In particular, Gonzalez's prior conviction, as charged in Count VI, is a June 20, 1996, conviction, in New York Supreme Court, Bronx County, for criminal sale of a controlled substance in the fifth degree, a Class D Felony. In the instant case, Gonzalez is charged in Count IV with distributing and possessing with intent to

distribute crack cocaine, in violation of Title 21, United States Code, Sections 812, 841(b)(1)(C), and Title 18, United States Code, Section 2.  Thus, Count IV directly places at issue Gonzalez's knowledge and intent to distribute or possess with intent to distribute narcotics.  Should Gonzalez dispute any of these issues, or any of the other purposes delineated in Rule 404(b), it will be proper for the Government to introduce evidence of Gonzalez's prior narcotics trafficking conviction pursuant to Rule 404(b), to show, among other things, Gonzalez's knowledge or intent, or to rebut a claim of innocent involvement with drugs.  See, e.g., United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." (citation omitted)); United States v. Fernandez, 829 F.2d 363, 367 (2d Cir. 1987) (per curiam) ("Where, as here, the defendant does not contest that he was present during a narcotics transaction but denied any wrongdoing, the use of [evidence of defendant's prior narcotics negotiations] is proper."); United States v. Martino, 759 F.2d 998, 1005 (2d Cir. 1985) (affirming trial court's admission of defendant's 11-year-old narcotics conviction to counter defendant's claim that he lacked knowledge and intent).

　　　　Accordingly, because the Government anticipates that it

will seek to introduce evidence of Gonzalez's prior narcotics conviction at trial for a lawful purpose pursuant to Rule 404(b), it would be premature for the Court to rule on Gonzalez's severance/bifurcation motion at this time.

**VII.      Gonzalez's Discovery Motion Should Be Denied As Moot**

Gonzalez also requests discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, to the extent it has not already been provided.  This motion is moot.  The Government has produced copies of the Rule 16 material in its possession to all of the defendants, including Gonzalez, and has invited the defendants to inspect copies of any physical evidence.  In particular, on or about May 16, 2008, the Government produced approximately 43 pages of discovery, which included, inter alia, the charging instruments, criminal history records, photographs, vouchers for physical evidence, reports and information related to fingerprint and DNA evidence, and defendants' statements.  The Government provided additional discovery on August 8 and August 13, 2008, consisting of results from firearms examinations and DNA testing results.  If or when the Government receives any additional Rule 16 materials, the Government will produce those in a timely manner and on a rolling basis to all defendants.  Thus, Gonzalez's motion for Rule 16 discovery is moot and the Court need not decide it.

54

**VIII.**    **The Defendants' Motion for Production of Brady and Giglio Material Should Be Denied As Moot**

Gonzalez, Richardson and Williams also seek the production of exculpatory and impeachment material pursuant to Brady and Giglio.  In addition, Gonzalez asks the Government to produce statements of all individuals that: (1) are inconsistent with prior statements of that individual or with statements of other individuals; (2) are inconsistent with the Government's theory of the case; or (3) raise questions concerning the reliability of any confidential informant or cooperator. (Gonzalez Br. at 11).  Williams further demands disclosure of impeachment material for any confidential informants who may testify, as well as the identify of any such informants. (Williams Br. at 15).

Under Brady, of course, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to guilt or to punishment.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Favorable evidence includes evidence that tends to exculpate the accused, see id., as well as evidence that is useful to impeach the credibility of a government witness.  See Giglio v. United States, 405 U.S. 150, 154 (1974). As the Court of Appeals has explained, Brady and Giglio material must be provided by the Government "in time for its effective use at trial."  United States v. Coppa, 267 F.3d 132, 146 (2d Cir.

55

2001).

As stated in the Government's discovery letters to defense counsel, the Government is not aware of any <u>Brady</u> material in this case.  The Government does, however, recognize its continuing obligation to disclose all such material, and will provide timely disclosure when and if any such material comes to light.  Courts in this Circuit routinely deny requests for <u>Brady</u> material where, as here, the Government has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under <u>Brady</u>.  <u>See</u>, <u>e.g.</u>, <u>United States v. Gallo</u>, 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of <u>Brady</u> material based on Government's representations that "it is aware of its obligations under <u>Brady</u> . . . and will produce any <u>Brady</u> material to the defense well before trial")(citing, <u>inter alia</u>, <u>United States v. Velasquez</u>, 96 Cr. 126 (JFK), 1997 WL 414132, at *6 (S.D.N.Y. July 23, 1997)); <u>United States v. Perez</u>, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

As to any impeachment material, courts in this Circuit have repeatedly refused to compel disclosure of impeachment or <u>Giglio</u> material far in advance of trial.  <u>See</u> <u>Gallo</u>, 1999 WL 9848, at *7-8 (denying defendants' motions to require the early production of <u>Giglio</u> and 3500 material); <u>Velasquez</u>, 1997 WL

414132, at *6-*7 (same); <u>United States v. Gutierrez-Flores</u>, 94
Cr. 393 (CSH), 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994);
<u>see also</u> <u>United States</u> v. <u>Nixon</u>, 418 U.S. 683, 701 (1974) ("need
for evidence to impeach witnesses is insufficient to require its
production in advance of trial").  Instead, as the Government
advised these defendants in its initial discovery letter, the
Government will adhere to its usual practice of producing <u>Giglio</u>
material, if any, at the time that it makes available the prior
statements of witnesses pursuant to 18 U.S.C. § 3500, and, in any
event, sufficiently in advance of any witness's testimony so as
to avoid delay at trial.

       To the extent Williams requests the Government to
disclose the identity of any confidential informant it may rely
upon at trial, or any other witness for that matter, this is
simply not information that the Government is required to
disclose pursuant to Rule 16, or any other provision, at this
time.  "Fed. R. Crim. P. 16 does not require the Government to
furnish the names and addresses of its witnesses in general."
<u>United States v. Bejasa</u>, 904 F.2d 137, 139 (2d Cir. 1990).  Nor
does any other rule or statute.  Indeed, "the prosecution [is]
under no obligation to give [a defendant] advance warning of the
witnesses who [will] testify against him." <u>United States</u> v.
<u>Alessi</u>, 638 F.2d 466, 481 (2d Cir. 1980).  While a district court
has inherent authority to compel pretrial disclosure of the

57

identity of Government witnesses, <u>see</u> <u>Bejasa</u>, 904 F.2d at 139,
there is a presumption against doing so.

A defendant who seeks in advance of trial a list of
government fact witnesses bears the burden of making a "specific
showing that disclosure [is] both material to the preparation of
[the] defense and reasonable in light of the circumstances
surrounding [the] case. <u>United States v. Cannone</u>, 528 F.2d 296,
301 (2d Cir. 1975). An "abstract, conclusory claim that such
disclosure [is] necessary to [the defendant's] proper preparation
for trial" is insufficient. <u>Id.</u> at 301-02. Here, Williams does
not even attempt to carry his burden of making a "specific
showing" of the need for disclosure of the identity of any
confidential informants or any other witnesses. As such, this
request should be denied.

## IX.    <u>Defendants' Demand For 404(b) Evidence</u>

Gonzalez and Richardson move for disclosure of evidence
the Government may seek to introduce at trial pursuant to Rule
404(b) of the Federal Rules of Evidence. (<u>See</u> Gonzalez Br. at
10; Richardson Br. at 7). They request that the Government
disclose this material sufficiently in advance of trial to afford
the defendants "meaningful opportunity to move to preclude the
introduction of such evidence." (<u>See</u> Richardson Br. at 7).

The Government is cognizant of the provisions for

58

pretrial notice in Rule 404(b), and will provide Rule 404(b) notice prior to trial. Rule 404(b) provides no strict time deadline for notification. That rule merely requires that the Government provide "reasonable notice in advance of trial, or during trial, if the court excuses pretrial notice on good cause shown" of its intent to use evidence of other crimes, wrongs, and bad acts. Fed. R. Evid. 404(b) (emphasis added). Indeed, ten days' notice has routinely been held to be adequate under the notice provision of Rule 404(b). See United States v. Valenti, 60 F.3d 941 (2d Cir. 1995) (in embezzlement case, four days' notice of evidence of prior wire transfers showing defendant's knowledge sufficient notice of other acts evidence under Rule 404(b)); United States v. Triana-Mateus, 98 Cr. 958 (SWK), 2002 WL 562649, at * 6 (S.D.N.Y. Apr. 15, 2002) (directing Government to provide 404(b) notice two weeks before trial). Requiring substantially more than ten days' notice would be inappropriate, however, because the evidence that the Government wishes to offer may well change as the proof and possible defenses crystallize. See United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).

In this case, no trial date has yet been scheduled and the Government is still determining what evidence, if any, it will seek to introduce at trial pursuant to Rule 404(b). Accordingly, the Government respectfully submits that it will

provide 404(b) notice at least ten working days (two weeks) before trial.  Such timely disclosure will enable the defense an opportunity to challenge the admission of any such evidence and the Court to make appropriate findings.  Accordingly, the defendants' motion should be denied.

### CONCLUSION

For the reasons set forth above, all of the pretrial motions should be denied without a hearing.

Dated:      New York, New York
            September 5, 2008

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney
                              Southern District of New York

                       By:   ___/s/ Jillian Berman_____
                              MARISSA MOLÉ/JILLIAN BERMAN
                              Assistant United States Attorneys
                              Telephone: (212) 637-2275/2197

<u>CERTIFICATE OF SERVICE</u>

JILLIAN B. BERMAN deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on September 5, 2008, she caused to be served a copy of the foregoing Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions, by filing it via Electronic Filing, thereby sending notice to all Counsel of Record.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.


_/s/ Jillian Berman_____
JILLIAN B. BERMAN


Executed on: September 5, 2008
             New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA             :        **ECF CASE**

         - v. -                      :        08 Cr. 363 (BSJ)

ROBERT ANTHONY GONZALEZ, et al.,     :        **AFFIDAVIT**

              Defendants.            :

- - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :  ss.:
SOUTHERN DISTRICT OF NEW YORK  )

JOHN BADYNA, being duly sworn, deposes and states:

1.   I am a Detective with the New York City Police Department ("NYPD"). I have been employed by the NYPD for approximately 22 years. Since joining the NYPD, I have participated in over a hundred robbery investigations.

2.   I was personally involved in the arrest of the four defendants in this case, Robert Anthony Gonzalez, Khalil Williams, Rasheem Richardson, and Mark Franco, on or about March 25, 2008. I was also personally involved in taking statements from defendant Khalil Williams after his arrest, and searching defendant Robert Anthony Gonzalez after his arrest.

<u>The Tip</u>

3.   On or about March 25, 2008, I received a tip from a source who has provided reliable information in the past (the "tipster"). The tipster informed me that several individuals who were likely to be armed were planning a robbery that evening of an electronics store located at 20 Bruckner Boulevard in the

Bronx, New York. The tipster also informed me that the individuals would be arriving in a dark-colored car.

<u>Circumstances of Stops and Arrests</u>

4.    Based on this information, I confirmed that there is an electronics store, called Media Plaza, located at 20 Bruckner Boulevard, Bronx, New York, and I went to that location around 8:00 p.m. on March 25, 2008. I was with an NYPD Sergeant ("Sergeant-1") in an unmarked police car and we parked in front of the Media Plaza store.

5.    At approximately 8:20 p.m., I observed a dark gray Honda Accord drive slowly past Media Plaza and pull into a parking space a few spaces past the entrance of Media Plaza on the opposite side of the street from the store.

6.    After several minutes, I observed the defendant later identified as Robert Anthony Gonzalez exit the Honda Accord from the back driver's side door. Gonzalez walked past the Honda Accord toward the next street corner away from Media Plaza, then walked across Bruckner Boulevard and back toward Media Plaza. As Gonzalez approached the Media Plaza entrance, he peered into the store and then slowly doubled back to the waiting Honda Accord across the street, and got back inside. As Gonzalez walked around the area, he appeared to be talking on his cellular telephone.

7.    At this point, traffic cleared from the street

2

behind where the Honda Accord was parked.  I then observed the
Honda Accord slowly back up and re-park directly across the
street from Media Plaza.

8.    A few moments later, I saw Gonzalez get back out
of the Honda Accord and walk back across the street toward both
Media Plaza and the car in which I was sitting.  Gonzalez again
appeared to be talking on his cell phone.  Based on my training
and experience investigating many robbery cases, I believed that
Gonzalez's conduct indicated that Gonzalez was "casing" Media
Plaza for the purpose of robbing that store.

9.    As Gonzalez crossed the street towards Media
Plaza, he suddenly changed direction and walked around the front
of my car and peered inside the front window.  The side and back
windows of my car were tinted, but the front window was not.  I
was sitting crouched down in the driver's seat of the car.
Sergeant-1 was in the back seat of the car.  Gonzalez made eye
contact with me, and then immediately turned and swiftly began to
leave the area away from both the Honda Accord and Media Plaza.

10.    As Gonzalez looked into my front window, I noticed
that Gonzalez's hands looked peculiar.  When Gonzalez then began
walking swiftly away from my car, Sergeant-1 and I followed him.
As Sergeant-1 and I reached Gonzalez in the street, I saw that he
was wearing latex gloves on his hands.  Sergeant-1 and I detained
Gonzalez and placed handcuffs on him.  Another officer later took

a photograph of Gonzalez's hands as they appeared when we placed handcuffs on him, which plainly shows that he was wearing latex gloves at the time. A copy of that photograph is attached hereto as Exhibit A. Gonzalez is a large man and at the time of his arrest, he was wearing loose-fitting clothing.

11. As Sergeant-1 and I were apprehending Gonzalez, additional officers in the area approached the Honda Accord from which Gonzalez had exited. Although I was not present at the moment that the other officers opened the car doors, I personally looked inside the Honda Accord within the next few minutes and saw latex gloves, duct tape, ski masks, and other items strewn throughout the inside of the car. Other officers placed the occupants of the Honda Accord, Khalil Williams, Rasheem Richardson, and Mark Franco, under arrest. All four defendants were then taken to the 40th Precinct in the Bronx.

## Search of Robert Anthony Gonzalez

12. Once at the 40th Precinct, I and other law enforcement officers conducted a strip search of Gonzalez. At that time I knew, based on my twenty-two years of law enforcement experience, that there are numerous places in or on his body where Gonzalez may have hidden a weapon or other contraband. I also knew from my experience that individuals who are arrested for felony offenses sometime hide weapons inside of them or on their person, and such weapons (or contraband) are not always

4

detected during a pat-down search.

13.  The strip search of Gonzalez occurred in a bathroom at the 40th Precinct.  In addition to myself and Gonzalez, three other police officers were present.  When I pulled Gonzalez's pants down, I observed a piece of a plastic bag protruding from his buttocks.  I removed that bag and it contained approximately 23 bags of a substance that field tested positive for crack cocaine.  These drugs had been partially hidden inside Gonzalez's buttocks.

### Khalil Williams' Miranda Warnings

14.  At approximately 2:50 a.m. on the night that Khalil Williams was arrested, I sat down to interview him at the 40th Precinct.  I read Williams his Miranda rights from a pre-printed NYPD form, a blank copy of which is attached as Exhibit B.  I did not have a blank copy of that form at the time for Williams to sign; I read from a form that had been completed by a prior arrestee.  Williams verbally responded that he understood each of his rights and that he was willing to answer questions, which I then recorded on a separate sheet of paper.  A copy of that paper is attached hereto as Exhibit C.  Specifically, I wrote down the following:

I DET BADYNA READ KHALIL WILLIAMS HIS RIGHTS
WHICH HE ANSEWERED [sic] YES TO THE QUESTIONS

I then marked an "X" on the page with a blank signature line. Khalil Williams reviewed that paragraph and signed on the blank

line.

    15.  Khalil Williams then wrote out his own statement in his own handwriting.  (*See* Exhibit C).  After writing out his statement, Williams signed the bottom of the page.  I also signed the bottom of the page, along with a fellow officer who was also present.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
       September 5, 2008

                                                           JOHN BADYNA

Sworn to before me this
5th day of September, 2008.

              NOTARY PUBLIC

       **ALEJANDRO RIVERA, JR.**
      Notary Public, State of New York
        Qualified in Orange County
      Registration No. 01RI6140286
    Commission Expires January 23, 20 10

6

# EXHIBIT A



# EXHIBIT B

# POLICE DEPARTMENT CITY OF NEW YORK

## Miranda Warnings

**The following warnings must be given to the subject before the interview begins:**

1. You have the right to remain silent and refused to answer questions. Do you understand?

   Subject replied: _____

2. Anything you do say may be used against you in a court of law. Do you understand?

   Subject replied: _____

3. You have the right to consult an attorney before speaking to police and to have an attorney present during any questioning now or in the future. Do you understand?

   Subject replied: _____

4. If you cannot afford an attorney, one will be provided for you without cost. Do you understand?

   Subject replied: _____

5. If you do not have an attorney available, you have the right to remain silent until you have had an opportunity to consult with one. Do you understand?

   Subject replied: _____

6. Now that I have advised you of your rights, are you willing to answer questions?

   Subject replied: _____

Subject signature: _____
Print: _____
Interviewing Officer: _____
Date: _____
Time: _____
Location of Interview: _____

# EXHIBIT C

3/26/08
250 AM
40 PCT JV ROOM

I DET BADYNA READ KHALIL WILLIAMS
HIS RIGHTS WHICH HE ANSEWERED YES
TO THE QUESTIONS   x _Khalil Williams_

Around 630 7:00 I was Picked up on
fordham by Mark. He drove me back
Me back home I went upstairs dropped
my leather Jacket off and 800 dallors
of mine. I took 20 dallors, my ID, and
my keys and went back outside. My Man
RAH CAlled me Said he had Some female
in Spanish Harlem and he wanted to get
fuck with. we got in the Car and left
My block which is 180st BATHGATE AVE
Got on the high way Got off by MC.
Donalds driving to the next high way
Mark got a call...by who I dont
Know. He ~~argued~~ spoke like in a heated
Covers ~~and the~~ for a few minutes then
pulled over right before we got on the
high way. my called me, we spoke
She ask me where I was going. I
lied And said hanging out with home
Boys. Police came from out of
no where like a hundred deep guns
Pointed told us Put our hands up
while Still in the Car. They opened all
doors and then precede to put us on
the Sidewalk and search us.

DET JB                02JOHRS        _Khalil Williams_
D